STATE OF MARYLAND, for the use of CLARA L. GABLE and ALFORD G. COALE, Trustees *vs.* GALLOWAY CHESTON and JAMES CAREY, Surviving Obligors of ISAAC COALE, JR.

*Construction of a Will—Transfer by Operation of Law of the Assets of a Testator's Estate from the Executors to themselves as Trustees under the Will—Jurisdiction of the Orphans' Court—If a party who is both Executor and Trustee executes a Conveyance in the Wrong Capacity, the Law attributes the Act to the Proper Authority—What constitutes Wasting of Assets—Technical Devastavit.*

By his will, admitted to probate in February, 1856, J. G. devised all the rest and residue of his estate, real, personal and mixed, after the payment of his debts and funeral expenses, to his wife, L. M. G., and to G. N. and to I. C., and to the survivor or survivors of them, in trust to allow his wife out of the rents, income, and profits of the same, to receive and to take the sum of two thousand four hundred dollars *per annum*, during her life-time, or as long as she continued unmarried. The will then read as follows: "And whereas, a considerable portion of my personal estate consists of the capital invested by me in the commercial house of McD. & G., in the City of Baltimore, I do hereby order and direct that the business of the said house shall be continued after my decease for the benefit of my estate, upon such terms and for such periods as may be agreed upon between my executors and the surviving part-

State, use of Gable, *et al. vs.* Cheston and Carey.

ner, and that my executors shall regularly receive and take out of the profits of said house, the share thereof, to which my estate will be entitled, and after paying to my wife the aforesaid provision for her support, that they shall safely invest the excess of said profits for the benefit of my estate; and whenever the said business shall be closed and my capital therein withdrawn, I do order and direct that as fast as the said capital shall be received by my executors, they shall invest the same in good and safe securities, that it may yield the means of paying the said annuity and increasing my estate for final distribution." After the death of his wife, the will provided for the division of J. G's estate into three parts, and each of these parts was devised to G. N. in trust for the testator's two daughters and his son, with contingent limitations over. J. G. then appointed L. M. G., G. N. and I. C. his executors, with power to sell or dispose of any portion of his estate, and to convey the same at their discretion for the purpose of carrying out his will. All the executors qualified as such, and gave separate bonds. The business was not carried on after J. G's death by his surviving partner McD. and the executors. The executors collected and recovered from McD. their testator's interest in the firm. The debts of the estate were paid, and two accounts were passed by the three executors in the Orphans' Court, one on the 22nd April, 1857, and the other on the 29th June, 1858. I. C. alone received the money of the estate at the time of passing the accounts and afterwards, and as acting executor managed the estate till his death in December, 1873. G. N. died in October, 1876, and the widow survives. L. M. G., G. N. and I. C. always dealt with the estate and professed to act in respect thereto, as executors. They purchased the leasehold and fee simple interest in property, in that capacity, under order of the Orphans' Court, and took the conveyances to themselves as executors, and subsequently sold the same as executors. On the 6th November, 1877, suit was brought by the appellants, appointed trustees under the will, in the place of L. M. G., the surviving trustee, on the separate bond of I. C. executed on the 6th March, 1856, with the appellees as sureties, to recover from them as surviving obligors, money alleged to be due by I. C. as executor of J. G. HELD:

1st. That the clause of the will which provided that the testator's business should be continued, as it had been conducted by the testator himself, was founded upon the idea that this duty pertained more appropriately to the office of executors than to that of trustees, but as the business was not so continued, that it was the duty

23     

State, use of Gable, *et al. vs.* Cheston and Carey.

of the executors simply to collect the testator's interest in the firm, as well as the other assets of his estate, or debts due to it, pay the debts, and then transfer the balance to themselves as trustees; and that in the latter capacity, it was their duty to administer the trust according to the provisions of the will, during the life of the widow, and upon her death to transfer the estate to the single trustee for the children.

2nd. That the persons who were both executors and trustees under the will, could not, at their own election, continue the office of executors after their duties as such had in fact ceased, and the time allowed by law for the settlement of the estate had elapsed, and when they should have acted as trustees; that they had no power to make investments, as that duty was devolved on them as trustees; and that the Orphans' Court had no jurisdiction over the administration of the trust; that the fact that the executors who were authorized to purchase and sell as trustees, took and executed conveyances as executors did not affect the title to the real estate in question, as the law will attribute the act to the proper authority.

3rd. That this is a case to which the doctrine of transfer by operation of law applies; that this principle holds parties who are both executors and trustees under a will to the same responsibility, and requires of them the same discharge of duty in respect to their several capacities, as if those capacities were represented by different persons; and that the principle must be applied to the exoneration of the appellees as sureties on the bond of I. C.

4th. That, assuming the proposition to be true that if the assets are wasted by the executor before his duties as such have ceased, so that nothing then remains in his hands, upon which the transfer by operation of law can operate, his bond as executor will still remain liable, there is no sufficent evidence in this case, that I. C. had so wasted the assets at any date prior to the time when by operation of law they would be considered in his hands as trustee.

It is not a mere technical *devastavit*, such as failing to keep the funds of the estate ear-marked and separate from his own, or mingling them with his own, that will amount to wasting of the assets of an estate by an executor. He will not be held to have wasted the assets, if he has in hand or under his immediate control a sufficient sum to meet all his liabilities as executor.

APPEAL from the Baltimore City Court.

The case is stated in the opinion of the Court.

State, use of Gable, *et al. vs.* Cheston and Carey.

*Exceptions.*—The case was submitted to and tried before the Court, and at the trial the plaintiff prayed the Court to declare:

1. That if the Court find from the evidence, that John Gable, late of Baltimore City, deceased, made his last will and testament as read in evidence, and that letters testamentary were granted thereon by the Orphans' Court of Baltimore City, to Isaac Coale, Jr., Louisa M. Gable and George Neilson, the executors named in said will, and that the defendants together with their principal, said Isaac Coale, Jr., now deceased, executed and delivered the testamentary bond offered in evidence, and that on the 8th May, 1856, said Isaac Coale, Jr., opened an account in the Union Bank of Maryland, in his name of Isaac Coale, Jr., executor of John Gable, and took into his possession, as the principal acting executor of said John Gable, the cash assets of said estate, as the same were from time to time received, and continued to keep said account in said bank in said name, checking out the moneys deposited therein at his pleasure, until July, 1862, when he closed the same, having at his pleasure checked thereout for his own purposes, all the moneys so deposited by him in said bank, and in August, 1861, opened an account in the Bank of the Republic, in the city of New York in his said name of executor, which he kept open until July, 1862, and on the 16th day of April, 1867, opened an account in the Franklin Bank of Baltimore, in his said name of executor of John Gable, which he kept open until October, 1868, when the same was closed—all the moneys therein having been drawn out and used by him. And if the Court shall further find, that on the 28th June, 1856, the said Isaac Coale, Jr., (together with his co-executors,) under an order of the Orphans' Court, purchased the leasehold interest in No. 94 West Monument street, for the sum of ten thousand dollars, and on the 11th day of September, 1860, the said Isaac Coale, Jr., (together with his

co-executors,) purchased for five thousand dollars the reversion in fee of said 94 West Monument street, taking the assignment of the leasehold therein, and the deed of the fee, in the names of said Coale, Neilson and Gable, as executors of John Gable, and that on the 13th day of May, 1866, he, (together with his co-executors,) purchased the leasehold property, known as No. 228 North Eutaw street, for $7500, taking the deed in the names of said executors. And if the Court shall further find that the said Isaac Coale, Jr., loaned the moneys in his hands as such executor, to various persons, including on several occasions the mercantile firms of Carey, Howe & Co. and Carey & Bangs, in which the defendant James Carey was a partner, acting in all his said transactions as executor of said John Gable, and that so far as the evidence shows, that he kept any accounts at all of his transactions with said estate, he kept them uniformly and uninterruptedly in his name as executor, and that on the 14th day of March, 1867, he, together with his co-executors, reported to the Orphans' Court of Baltimore City, that in pursuance of the power conferred upon them by the will of said John Gable, they had sold the property known as No. 94 West Monument street, to James Carroll, Jr., for $21,000; and that upon their said report, said sale so made by them as executors of John Gable, was finally ratified and confirmed by said Orphans' Court, on the 16th day of April, 1867, after thirty days' notice by publication: and that said Isaac Coale, Jr., as such executor, received said purchase money and deposited $20,077.72 thereof, to his credit in the Franklin Bank of Baltimore, in his name, as executor of said John Gable; and that in 1870, he was cited by the Orphans' Court of Baltimore City, to render a further account of the estate of said John Gable in his hands, as executor thereof; and that in 1871, he paid, as such executor, to the widow of John Gable, the sum of $7327.29, as mentioned in the agreed statement of facts; and if the

Court further find, that on the 29th June, 1859, the said executors passed their second administration account in the Orphans' Court, by which there appeared to be due by them to the estate, the cash balance of $42,352.29; and that at the time of the passage of said account, the said Isaac Coale, Jr., only had to his credit, as such executor, in bank, the cash balance of $8078.75, and that he then had no other bank account as such executor, and that subsequently in July, 1859, he received, as such executor, the further sum of $4347.68, and in January, 1860, the further sum of $2772.63, and $1090, belonging to said estate of John Gable; and that in 1871, he caused to be prepared by the auditor of the Orphans' Court a further administration account for the said Orphans' Court, in obedience to said hereinbefore mentioned citation; and that from the time of the granting of the letters testamentary to him as executor of said John Gable, down to his death on December 31st, 1873, he always claimed to act, and did in fact act in all his transactions of every description, with, for or on account of the estate of said John Gable, in the open and avowed capacity of executor of said John Gable; and that he in fact never terminated, or intended to terminate his office, functions or responsibility of executor of said John Gable; and that he never transferred in form or in fact the funds so as aforesaid received by him as such executor, and actually in his individual and sole possession as such, to himself and said Louisa M. Gable and George Neilson, as trustees under the said will of said John Gable; and that there never was any order of the Orphans' Court directing such transfer to be made, and that no deed or other conveyance was ever made transferring the property held by such executors, or either of them, to themselves as trustees; and that neither the said Coale, Gable or Neilson, ever in fact acted, or claimed to act, as trustees under said will; and that all the receipts and disbursements, purchases and sales, loans and other trans-

State, use of Gable, *et al. vs.* Cheston and Carey.

actions made by said Coale from 1856, down to 1873, in respect of said estate of said John Gable, were made by him in the name, character and capacity of executor of said John Gable, then upon such facts, if found by the Court, no presumption of law arises that on the 29th of June, 1858, or at any day prior or subsequent thereto, the functions, office and responsibility of said Coale, as such executor, had ceased, and that the funds then in his hands belonging to the estate of said John Gable, were then transferred by mere operation of law to himself, as one of the trustees of said John Gable, and the administration of said estate of said John Gable was then finally closed and settled by said executors; and if the Court shall further find that the said Coale, whilst so claiming to act, and in fact and in name so acting as such executor of John Gable, from time to time during said period, misappropriated, misapplied, lost or otherwise wasted the said sums so received by him as such executor, or any part thereof, and died on the 31st December, 1873, insolvent, and heavily indebted as such executor, to the estate of said John Gable, for the sums so received, wasted or misappropriated by him as such executor, then the plaintiff is entitled to recover from the defendants, as sureties on said testamentary bond of said Coale, to the extent of such misappropriation or waste, (not exceeding the penalty of said bond,) less the several sums admitted by the agreed statement of facts to have been recovered since the death of said Coale, from his real, personal and co-partnership assets:

2. That the ordinary presumption, by virtue of which, in the absence of special circumstances, there would have been a transfer by operation of law, of the assets of the estate of John Gable, in the hands of his executor, Isaac Coale, Jr., to the said Coale, as trustee under the will, is in the case rebutted by facts and circumstances, and the testamentary bond of said Coale has never been discharged.

State, use of Gable, *et al. vs.* Cheston and Carey.

3. That the order of the Orphans' Court of Baltimore City, passed on the 16th April, 1867, ratifying, after due notice by publication, the sale by the executors of the real estate mentioned therein, being the act of a Court of competent jurisdiction, and never having been reversed, rescinded or set aside, is conclusive as to the validity of said sale, the power of said executors under the will to make it, and that they made it in the proper character and capacity.

4. That the order of the Circuit Court for Baltimore County, ratifying account D, makes said account *prima facie* evidence in this case: 1st. As to the fact of the *devastavit.* 2nd. As to the amount. 3rd. As to the time or times when committed. 4th. As to the character of executor of said Coale, and that as no evidence has been adduced, other than that passed upon by said Court, tending to surcharge the credit side or falsify the debit side of said account, said account should be adopted by this Court as the basis upon which the amount of the liability of the defendants is to be determined.

5. That if, in the opinion of this Court, it is competent for the defendants in this case to call in question the correctness of the principle upon which said account D was framed and ratified, and to contend in favor of the principle upon which the rejected Account E was framed, then the Court is respectfully asked to decide that said Account E was properly rejected, and said Account D properly ratified, for the reasons assigned by said Circuit Court for Baltimore County in its written opinion, which is prayed to be taken as part hereof.

6. That until the order of the Circuit Court of Baltimore City, substituting the present equitable plaintiffs as new trustees under the will of John Gable, there was no person *in esse* competent to sue upon said bond, and the Statute of Limitations is no bar to this action.

7. That until the death of Isaac Coale, Jr., 31st December, 1873, there was no person *in esse* competent to sue on

said bond, and the Statute of Limitations is no bar to this
action.

8.  If the Court shall find the facts hypothetically stated
in plaintiff's first prayer, but upon such facts shall be of
opinion that the plea of the Statute of Limitations inter-
posed by the defendants, precludes the plaintiff from
recovering from them, for any sum or sums received by
the said Coale, as executor of John Gable, and misappro-
priated and wasted by him (prior to) twelve years or more
before the institution of this suit, then the sum of $7327
paid by said Coale in 1871 to the widow of John A. Gable,
and the sums recovered since his death, are first to be
applied towards the extinguishment of the antecedent
indebtedness of said Coale, as such executor, existing
(prior to) twelve years or more before the institution of
this suit, and not to his indebtedness, as such executor, on
account of sums belonging to said estate of John Gable,
received and wasted by him, as such executor, within
twelve years before his death.

The defendants prayed the Court as follows:

1.  That as to the sum of $42,352.39, being the balance
shown by the administration account, settled on 29th
June, 1858, the same must, by operation of law, be con-
sidered in the hands of the persons named in the will of
John Gable as trustees, for the trust purposes mentioned
in said will, from and after that day, and not as any
longer in their hands as executors under said will, *because*
the said executors and trustees are the same individuals,
notwithstanding all the evidence of the plaintiff shewing
that said executors, or any of them, had undertaken to
act as executors after that day in respect to said balance,
or any part thereof, and for this reason the plaintiff can-
not recover as to said balance.

2.  That as to the several sums of money mentioned in
the agreement read in evidence, as having been received
by the executors of John Gable in the years 1859 and

1860, they must, for the same reason as mentioned in the first prayer, be considered in the hands of said trustees, within a reasonable time after their receipt by said executors, that is to say, at or before the expiration of thirteen months after the dates of the receipts of said sums respectively, so that plaintiff cannot recover as to these sums.

3. That even if the said executors, or any of them, had wasted the assets of said estate, or any part thereof, before the date of the additional account, dated 29th June, 1858, there can be no recovery under the pleas of limitations filed in this case as to said balance, or any part thereof so wasted.

4. That there is no sufficient evidence in the case of the wasting of the assets of the estate of John Gable by his executors, at any date prior to the time when, by law, they would be considered in their hands as trustees, to prevent the operation of the principle of law referred to in the first prayer.

5. The defendants except to the admissibility in evidence of the following matters offered by the plaintiff, and to each and every of them, severally and separately, as hereinafter particularly enumerated and set out, for the purpose of contravening the right of defendants to set up and insist on the principle of law enumerated in the first prayer, viz: the transfer by operation of law of the funds in the hands of the executors to the tenure of the same persons as trustees.

1st. The deed of 11th September, 1860, from Brady, of the reversion of the Monument street property.

2nd. The deed from Baxley to the executors, dated 13th May, 1866, of the Eutaw street property.

3rd. The deed from the executors to James Carroll, Junior, of the Monument street property.

4th. The account in the Union Bank, in the name of Isaac Coale, Junior, executor.

5th. The account in the Bank of the Republic.

6th. The account in the Franklin Bank.

7th. The checks entered as paid to Carey and Bangs.

8th. The several checks on the Franklin Bank, offered in evidence.

9th. The statement of McKim & Co., of the purchase of United States Bonds.

10th. The papers relating to money borrowed by Carey, Howe & Co.

11th. The papers in the case of *Gable & Co. vs. Coale, &c.*, in Baltimore County.

12th. The testimony of Miss Clara Gable, in said last mentioned case.

13th. The testimony of Alford G. Coale, in said last mentioned case.

14th. The testimony of Neilson, executor, in said last mentioned case.

15th. The account with date, 1871, intended to have been passed in Orphans' Court but not passed.

16th. All the vouchers offered with the last mentioned account.

6. And the defendants further except to the admissibility of each and every item of said several pieces of evidence as numbered and set out in the fifth prayer, so far as the same are offered by the plaintiffs as tending to shew a wasting of the assets of the estate of said John Gable, by the said executors, or by either of them.

7. And the defendants further except to the admissibility of each and every item of said several pieces of evidence, as numbered and set out in the fifth prayer, so far as the same are offered by the plaintiffs as tending to prevent the operation of the pleas of the Statute of Limitations, in bar of any right of the plaintiffs to recover.

8. That the three persons to whom, by the will of John Gable, the residue of his estate was bequeathed in trust, having also been appointed executors by said will,

and having obtained letters testamentary, and having passed the account offered in evidence, charging themselves with a cash balance of $42,352.39, it was then their right and duty to retain said sum in their hands in part payment of said legacy to them, and if they failed to do so, they could not, nor can their successors, for whose use this action is brought, hold the defendants, as sureties on the bond of Coale, responsible to them for the loss or waste of any part of said balance.

9. That the proceedings in said case, in the Circuit Court for Baltimore County, of *Gable, &c. vs. Coale, &c.*, are not evidence of the amount for which the sureties in this suit may be liable, but a new and proper account must be stated in this case, independently of the adjudication in that case, if this Court should, for any reason, be of opinion that the defendants are liable for any sum whatever.

10. That if the Court find that part of the estate of John Gable was invested in the house on Monument street, and that the said property was sold by said executors, as shewn by the evidence of plaintiff, and that any part of the moneys received from said sale has been lost or wasted, that these defendants, as sureties on the executor's bond of Isaac Coale, Jr., are not responsible for such loss or waste in this action.

11. That as to the sums of money mentioned in the agreement, offered in evidence, as having been received by Isaac Coale, Jr., executor, in 1857 and 1860, if the Court shall find that said sums of money were received by him, in virtue of some agreement, authority or consent of his co-executors, that he should receive said sums of money and manage the estate of said Gable in relation thereto, and that said sums of money, or any part thereof, were lost to the estate, or wasted by the negligence or nonperformance of duty on the part of said three executors, or by the misconduct or negligence of said Coale, that

then the said defendants, as sureties on the bond of said Coale, as executor, are not responsible in this action.

12. That the claim of the plaintiff in this case is barred by the pleas of the Statute of Limitations, because the breaches of the conditions of the defendants' bond, if any, for which they would have been liable, occurred more than twelve years before the commencement of this suit.

13. If the Court find that the residuary legatees named in the will, were the same persons as the executors therein named, and that said parties obtained letters testamentary, and accepted the trust, and that the present plaintiffs were appointed in place of the surviving legatee in trust, then upon the facts in this case the testamentary bond sued upon is not liable for the said legacy of the residue of the estate in this action.

The Court (PINKNEY, J.,) granted the prayers of the defendants, numbered one, two, four, five, six, eight and ten, and rejected the prayers of. defendants numbered, three, seven, nine, eleven, twelve and thirteen; and rejected the prayers of the plaintiff numbered one, two, three, four, five and eight, and granted the sixth and seventh prayers; the plaintiff excepted; and the verdict and judgment being for the defendants, the plaintiff appealed.

The cause was argued before BARTOL, C. J., BRENT, MILLER, ALVEY and ROBINSON, J.

*John P. Poe*, and *Charles E. Phelps*, for the appellant.

There can be no doubt as to the fact of *devastavit*. The will of Mr. Gable provides for the annual allowance of $2400 to Mrs. Gable, and the investment for accumulation for the benefit of the parties in remainder of the surplus income over such annual allowance. Without regard to accumulations the waste is apparent from the evidence in the case.

State, use of Gable, *et al. vs.* Cheston and Carey.

A more complete statement of this *devastavit* appears from account D, finally ratified by the Circuit Court for Baltimore County, in the case of *Gable and Neilson, Surviving Executors, &c. vs. Helen M. Coale, et al.* This was a general creditors' bill filed on 18th February, 1874, in the Court above mentioned, against Mrs. Coale, widow and administratrix of Isaac Coale, Jr., and against his heirs at law; and under these proceedings his real estate was sold by trustees appointed for the purpose.

Auditors' accounts were stated, and finally on April 20th, 1877, the Court ratified the account representing the claim of the Gable estate by which Isaac Coale, Jr., was shown to be indebted to that estate in the sum of over $40,000, of which amount $9300 were received by the Gable estate from the sale of his real estate.

The account D, ratified by the Circuit Court for Baltimore County, is *prima facie* correct, and until falsified, shows the indebtedness of Mr. Coale, as executor, to the Gable estate. *Iglehart vs. State,* 2 *G. & J.,* 235; *Stowall vs. Banks,* 10 *Wallace,* 583; *Owen vs. Collinson,* 3 *G. & J.,* 35; *Beall, Ex'r vs. Osbourn,* 30 *Md.,* 11; *Roberts vs. Woven Wire Co.,* 46 *Md.,* 374.

For this *devastavit* the appellees, as surviving obligors upon the testamentary bond of Mr. Coale, as executor, are responsible.

Where the fund has been actually spent and wasted *before* the arrival of the time when the transfer is to take effect, and no longer exists, therefore, as a fund to be transferred, the enforcement of such a doctrine as that relied on by the other side, must necessarily lead to the grossest practical injustice, by discharging, without any satisfaction whatever, *a vested right of action,* and extinguishing a liability actually accrued for a breach of bond of the most palpable character, and it is believed that in no well considered case, where the fact of antecedent *devastavit* was shown, has the principle asserted by the

appellees been maintained. A vested right of action is *property* which not even an Act of the Legislature can take away. *Williar vs. B. L. &c.*, 45 *Md.*, 547–560. Much less can such a result be accomplished by mere "operation of law."

In none of the Maryland cases cited by them is the precise point decided, while, wherever the question has been examined elsewhere, the decision has been against the application of a doctrine so unjust and unreasonable. *Smith vs. Gregory*, 26 *Grattan*, 248; *Conkey vs. Dickinson*, 13 *Met.*, 51; *Wilson vs. Wilson*, 17 *Ohio St. Rep.*, 156; *Shelton vs. Ordinary*, 3 *McCord*, 412; *Taylor vs. Deblois*, 4 *Mason*, 1345; *McMechen vs. Huson*, 3 *Strobhart's Law*, 327; *Trimmier vs. Trail*, 2 *Baily*, 486; *Wynne vs. Edward*, 7 *Hump.*, 418; *Morrow's Adm'r vs. Peyton's Adm'r*, 8 *Leigh*, 54–77; *Pratt vs. Wortham*, 5 *Mason*, 90.

It was the duty of the executors to invest. They failed to discharge this duty, and their bond was broken by such failure, and the sureties are liable for the loss eventually sustained. Moreover, the bond of Coale became liable when he used the funds for his own purposes. *Sullivan's Adm'r vs. Howard*, 20 *Md.*, 194; *Brooke vs. Brooke*, 12 *G. & J.*, 306–319; *Spottswood vs. Dandridge*, 4 *Munford*, 289; *Moore vs. Armstrong*, 9 *Porter*, 697–706; *Carow vs. Mowatt*, 2 *Edw. Ch.*, 57; *Evans vs. Iglehart*, 6 *G. & J.*, 196–7; *Miller vs. Williamson*, 5 *Md.*, 219; *Jenkins vs. Walter*, 8 *G. & J.*, 223–5; *State vs. Murray*, 24 *Md.*, 310; *Clough vs. Bond*, 3 *Myl. & Cr.*, 496; *Case vs. Abiel*, 1 *Paige*, 402; *Robinson vs. Ward*, 12 *E. C. Law*, 28; *Archbishop of Canterbury vs. Robertson*, 1 *C., M. & R.*, 690.

The presumption of transfer, by operation of law, is not an absolutely fixed and inflexible rule of law, to be applied without regard to the actual facts, but is nothing more than a rule or presumption, which stands good until rebutted, and here it is completely rebutted by the proof in the case. *Gardiner vs. Semmes*, 1 *Gill*, 428; *Lark*

*vs. Linstead,* 2 *Md.,* 426–7; *Pratt vs. Northam,* 5 *Mason,* 108, 109, 110; *Taylor vs. Deblois,* 4 *Mason,* 134–5; *Conkey vs. Dickinson,* 13 *Met.,* 54; *Allender vs. Riston,* 2 *G. & J.,* 99; *Best on Evidence,* 419; *Hanson vs. Worthington,* 12 *Md.,* 440; *Estate of Brown,* 8 *Phila.,* 197; *Wilson vs. Wilson,* 17 *Ohio State,* 156; *Myers vs. Rand,* 6 *Randolph,* 444 446; *Flickinger vs. Hull,* 5 *Gill,* 60; *Smith vs. Gregory,* 26 *Grattan,* 248; 6 *Yerger,* 223; 2 *Williams on Ex'rs,* 1506, *note m;* 9 *Medcalf,* 534.

Mr. Coale never assumed to act as trustee in any one transaction in relation to the estate. On the contrary, *all* his dealings were as *executor.* These dealings are set out in detail in the plaintiff's first prayer.

Upon the subject now under review there are three distinct classes of cases.

1st. Where, at the time fixed for the transfer, the property specifically exists, or the fund is actually on hand, ear-marked, identified, and capable of being transferred.

This is the class of cases in which the doctrine has been most usually applied. *Henderson vs. Ward,* 3 *Dev. Law,* 417; *Clancy vs. Carrington, Ibid,* 529. See also *Miller vs. Congdon,* 14 *Gray,* 114; *Phillips vs. Manning,* 2 *M. & Cr.,* 309–315; *Burge vs. Brullar,* 2 *Hare,* 373; *Hill on Trustees,* 237; 1 *Perry on Trusts, sec.* 262, *&c.*

2nd. Where, at the time fixed for the transfer, the property or fund does not specifically exist, capable of being transferred, but has been used for his own purposes by the executor, and exists, therefore, only in the shape of a debt from him, *he, however, being solvent.*

3rd. Where the fund has been used and spent, and the executor *is insolvent.*

An examination of the authorities, it is believed, will show that the only cases in which the doctrine has been enforced are those coming under the first class, and in those cases it does not appear that a transfer in fact had

not been made.  *Byrd vs. State*, 44 *Md.*, 492; *Edes vs. Garey*, 46 *Md.*, 24.

 *Edward Otis Hinkley*, and *I. Nevett Steele*, for the appellees.

The appellees contend, that the Court was right in granting the defendants' prayers and in refusing the plaintiff's and in rendering judgment for the defendants, because:

The principle of law referred to in defendants' first and second and fifth and eighth prayers, is not one of *presumption* only, but of such force in its operation as to prevent executors who are trustees in the same will from exercising any choice on the subject, and to hold them only in their rightful office as trustees, and not as executors, after the lapse of the time when the operation of the principle has effected a transfer.

The operation of the principle prevents any liability as executors after the time for transfer; and so there can be no wasting *as executors* after that day; hence, defendants' prayers—fourth and sixth and tenth—are right.

The refusal by the Court of defendants' prayers about limitations—third, seventh and twelfth—and granting plaintiff's sixth and seventh, show more plainly the necessity of the application of the principle, and the necessity of a transfer by operation of law; for otherwise, an executor who was also trustee might hold his sureties liable as long as he lived; and this at his *discretion*, although wrongfully exercised.

At the moment of taking out letters of administration, the executors also became trustees, no bond being required in Maryland from testamentary trustees, unless some person requires it.

The duties of the executors in this case were done as soon as time for payment of debts and funeral expenses had elapsed, and they were paid; and the title of the

legatees was then vested, so that if they had been different persons they might then have sued.

The limit in Maryland within which executors ought to pay debts, &c., is thirteen months; but at utmost in this case, the debts having been all paid, the balance shown in second account on 29th June, 1858, was then the property of the legatees.

In like manner, every sum of money thereafter received by the executors must either at the date of its receipt, or at some reasonable time thereafter—say, at utmost twelve months—belong to the legatees in trust.

As the legatees in trust were the same persons as the executors, and could not sue themselves, the funds in the hands of the executors were, by operation of law, transferred to their hands as trustees, as soon as the right to demand the same accrued to the trustees.

The executors not having, in fact, carried on the business of the testator with his surviving partner, under the powers in the will, no argument can be drawn from such powers to authorize the detention of the estate in the hands of the executors, further than as allowed by law, if no such power had been given to them.

The only gift in this will after payment of debts, &c., being of all the rest of the estate of the testator to the trustees, no power existed in the executors to detain the estate after their second account, for any purpose.

There is no discretion vested in executors in any case under the law of Maryland to detain an estate, after debts, &c., are paid, and this will gives none to the executors.

The mention in the will of the words executors and trustees indiscriminately, when the same persons are named for both offices, cannot be availed of to fix on executors trust duties; but they shall be considered as acting in the true capacity, whatever name they use.

There is no right in an executor who is also a trustee, to continue the liability of his bondsmen, after the date

when a transfer of funds in his hands is made by opera-tion of law—either by using his name as executor, or in any other way.

If there were in this case any day, after the rendition of the account of 29th June, 1858, for the executors to do anything with the funds then in their hands, it was only to make some formal transfer of them within a reasonable time thereafter; and as this was not done, the law will, to prevent injustice, hold the rights and liabilities of all parties to be only the same as if they had done it.

The jurisdiction of the Orphans' Courts of Maryland is limited, and they are expressly prohibited by the Code, Art. 93, sec. 252, and Art. 16, sec. 68, from exercising any powers in relation to trusts, so that after rendition of an account showing debts, &c., all paid, by executors, under a will that gives them nothing more to do than to pay debts and funeral expenses, and then hand over the rest of the estate to themselves as legatees in trust, the juris-diction of that Court ceases; and if, after the rendering of such account, those who ought to act as trustees continue to act as executors, and the Orphans' Court does in any way take jurisdiction, it is an error which the other Courts of competent jurisdiction will not permit to work any wrong by extending the liability of the bondsmen of such executors; the plain answer of a bondsman in such case being; *non in hæc fœdera veni.*

The whole case turns on the supposed power in execu-tors who are also trustees, *at their choice* so to act, after the date when, by operation of law, a transfer is made of the funds in their hands from one capacity to the other, as to defeat the operation of that rule of law.

Can it be tolerated in Maryland that any executor who is also trustee should have the power, by a mere scratch of his pen, by using the name of executor when he should have used that of trustee, to determine the liability of

State, use of Gable, *et al. vs.* Cheston and Carey.

his bondsmen, and turn the scales of justice so as to hold them or release them at his pleasure?

An examination of the Maryland cases in relation to the rule of law on this subject, would seem to indicate too plainly to admit of a doubt, that no principle of *choice* in an executor in such a case has been made the ground of decision, or been recognized as existing.

The Maryland cases on the subject, are uniform in holding that where one person holds two capacities, there must, by operation of a principle of law, be a transfer of funds to him in that capacity in which he ought rightfully to hold; and that the *law itself* operates this, *because* a man *cannot sue himself,* or compel himself by any means. *State vs. Jordan,* 3 *H. & McH.,* 179; *Downes vs. State,* 3 *H. & J.,* 239; *Seegar vs. State,* 6 *H. & J.,* 162; *Watkins vs. State,* 2 *G. & J.,* 220; *Boyd vs. Boyd,* 6 *G. & J.,* 33, 235; *Gardner vs. Simmes,* 1 *Gill,* 425; *Ellicott vs. Ellicott,* 3 *Gill,* 439; *Thomas vs. Wood,* 1 *Md. Ch.,* 304; *Lark vs. Linstead,* 2 *Md. Ch.,* 162; reversed on appeal, 2 *Md.,* 420; *Flickinger vs. Hull,* 5 *Gill,* 60; *Carson vs. Phelps,* 40 *Md.,* 98; *Connor vs. Ogle,* 4 *Md. Ch.,* 448; affirmed on appeal; *Hanson vs. Worthington,* 12 *Md.,* 440; *Sparks vs. Weedon,* 21 *Md.,* 156; *Tilly vs. Tilly,* 2 *Bland,* 445.

Cases in other States agree in principle, viz: *Taylor vs. Deblois,* 4 *Mason Ct. Ct.,* 131; *Sims vs. Lively,* 5 *B. Mon. (Ky.,)* 433; *Drane vs. Bayliss,* 1 *Humphrey, (Tenn.,)* 174; *Jennings vs. Davis,* 5 *Dana,* 127; *Danning vs. Ocean Nat. Bank,* 61 *N. Y.,* 497; *Vardeman vs. Ross,* 36 *Texas,* 111; *Ingle vs. Jones,* 9 *Wallace,* 486; *Weir vs. People,* 78 *Ill.,* 192; *Anderson vs. McGowan,* 42 *Ala.,* 280; *Myers vs. Wade,* 6 *Rand., (Va.,)* 483; *Mastin vs. Barnard,* 33 *Ga.,* 520; *Harrison vs. Henderson,* 7 *Heiskell, (Tenn.,)* 315; 6 *Paige,* 415, 416; 2 *Littell,* 314; 6 *Iredell Eq.,* 60, 66; *Dix vs. Burford,* 19 *Bevan,* 409; *Phillips vs. Munning,* 2 *My. & Cr.,* 309; *Ex parte Dover,* 5 *Simon,* 500; *Lewin on Trusts,* 243; *Brougham vs. Poulett,* 19 *Beav.,* 119.

State, use of Gable, *et al. vs.* Cheston and Carey.

In *Redfield on Wills, 2nd part, pages,* 120, 211 *and* 212, there is a plain approbation of the principle; and the date of the transfer is stated to be the giving of the bond by trustees, &c.; but in Maryland, trustees in wills do not give bonds unless required; and in *Hanson vs. Worthington,* 12 *Md.,* 440, it is held that the taking out of letters is an acceptance of the trust. The title to the property, then, is vested in the trustees in Maryland at the moment when if others were legatees they might have sued. Many cases have settled in Maryland that this is after thirteen months, whether an account has been stated or not. *State vs. Wilson,* 38 *Md.,* 338.

MILLER, J., delivered the opinion of the Court.

In this case suit was brought upon the bond of Isaac Coale, Jr., as one of the executors of John Gable whose will was admitted to probate in February, 1856. By this will the testator devised all the residue of his estate, real and personal, after payment of debts and funeral expenses, to his wife, Louisa M. Gable, George Neilson and Isaac Coale, Jr., and the survivor of them, *in trust* for the purposes therein stated, and appointed the *same parties* his executors. All the executors qualified as such, and gave separate bonds. Coale, who had married one of the daughters of the testator, appears to have taken upon himself the principal mangement of the estate, and died in December, 1873. Neilson died in October, 1876, and Mrs. Gable is still living. The bond sued on was executed on the 6th of March, 1856, and the suit was instituted on the 6th of November, 1877, more than twenty-one years after the date of the bond. The equitable plaintiffs are parties who were appointed *trustees* under the will in place of Mrs. Gable, the surviving trustee, who asked to be relieved from discharging the duties of the trust. The order appointing them, passed two days prior to this suit by the Circuit Court of Baltimore City, upon application

therefor, authorized them to bring suit upon the bond of Coale, in order to recover from the sureties therein a large amount of money alleged to be due by him *as executor.* The sureties pleaded limitations, and also relied upon the defence that the assets of the estate received and collected by Coale as executor, had, long prior to his death *been transferred by operation of law,* to himself and his co-trustees under the will. The case was submitted to the Court without the intervention of a jury upon an agreed statement of facts, and upon the evidence which appears in the record. The effect of the Court's rulings upon the several prayers offered on both sides, was to overrule the defence of limitations, and to sustain that of transfer by operation of law. The judgment was consequently in favor of the defendants, and the plaintiffs have appealed. The only question, therefore, for review is whether the rulings of the Court in favor of the defendants were correct.

The first inquiry looking to a solution of this question is, what were the duties of the *executors* under the will, and how long did their functions as such continue? This depends upon the construction of the will itself. The testator first makes an absolute devise to these parties, and the survivors or survivor of them, of all the rest and residue of his estate, real, personal and mixed, after payment of debts and funeral expenses *in trust* to allow his wife to take and receive out of the rents, income and profits of the same, the sum of $2400 annually during her life, or as long as she continues unmarried, and after her death he divides his estate into three parts, and devises each of these parts to Neilson, one of the same parties, *in trust* for his two daughters and his son, with contingent limitations over, and then appoints the same parties his executors, with power to sell or dispose of any portion of his real or personal estate, and to convey the same at their discretion for the purpose of carrying out his will.

Now intermediate the devise in trust in favor of his wife, and that in favor of his children after her death, is this clause: "And whereas a considerable portion of my personal estate consists of the capital invested by me in the commercial house of McDowell & Gable, in the City of Baltimore, I do hereby order and direct that the business of the said house shall be continued after my decease, for the benefit of my estate, upon such terms and for such periods as may be agreed upon between *my executors and the surviving partner*, and that my executors shall regularly receive and take out of the *profits* of said house, the share thereof to which my estate will be entitled, and after paying to my wife the aforesaid provision for her support, that they shall safely invest the excess of *said profits* for the benefit of my estate, and whenever *the said business shall be closed and my capital therein withdrawn*, I do order and direct that as fast as the said capital shall be received by my executors, they shall invest the same in good and safe securities that it may yield the means of paying the said annuity, and increasing my estate for final distribution."

It seems very manifest that the intent which pervades this entire clause and controls its construction is, that the business of the firm should be carried on after the testator's death, by an arrangement between his executors and the surviving partner. The language used and the provisions made are all plainly referable to this continuation of the firm business. The profits to be made and the capital when withdrawn, upon the closing of the business *so to be conducted*, as well as the duty of conducting and managing the business itself, are confided to the care of the executors. The duty of carrying out an arrangement by which his commercial business was to be continued as it had been conducted by the testator himself, is one that pertains more appropriately to the office of *executors* than to that of *trustees*, and the whole clause is founded upon that idea. If the business was not to be so continued, there

was no reason for the existence of this provision. If the executors were simply to collect the interest of the testator in this firm, as any other asset of his estate or debt due to it, there is no reason why it should not pass to the *trustees* with, and at the same time the other portions of the estate passed to them, under the devise of all the rest and residue of his property. Now this is precisely what the executors did. It is admitted the business was not carried on after the testator's death by his surviving partner and the executors. The latter either declined to carry on the business, or the surviving partner refused to enter into any such arrangement with them. The executors therefore proceeded at once to collect and receive from McDowell, their testator's interest in this firm. The continuation of the business according to the testator's wish having thus failed, we are clearly of opinion that all the duties imposed upon the executors under this clause of the will, ceased to be obligatory upon them. In other words, the whole clause fell with the failure of the main object it was its purpose to effect.

Such being in our opinion the true construction of this will, the duties which it, as well as the law imposed upon these parties in their two-fold capacity of executors and trustees are too plain to admit of controversy. As executors it was their duty simply to collect the assets, pay the debts, and then transfer the balance to themselves as trustees. In the latter capacity it was their duty to administer the trust according to the provisions of the will, during the life of the widow, and upon her death to transfer the estate to the single trustee for the children. Now what was done? The debts were few, of small amount, and were promptly paid. Two accounts were then passed in the Orphans' Court, the first, on the 22nd of April, 1857, showing a balance due the estate of $25,657.34, of which $22,786.49 consisted of cash, and the second, on the 29th of June, 1858, showing a balance of $45,223.44, of

which $42,352.29 was cash. These accounts were passed by the three executors and were sworn to by all of them, but we shall assume as the proof seems to establish, that the money was collected and received by Coale alone. We shall not stop here to notice the fact that a portion of this money was invested in the purchase of property, or to follow the evidence that traces out the final disposition of a part of the property so purchased, and the amount ultimately realized from various sources to the estate of the testator. After the passage of these accounts it is admitted that Coale received the additional sums of $4347.68 and $3862.63, the first, on the 4th of July, 1859, and the second, about the 1st of January, 1860. It thus appears that a very long period after the debts had been paid and the time allowed by law for the settlement of the estate by the executors, and their receipt of all assets, for which the executor's bond sued on is sought to be held responsible, had elapsed before this suit was instituted. If, therefore, the doctrine of transfer by operation of law, has any foundation in reason and justice, this is a case which calls for its application, and very stringent and satisfactory objections to its operation must be adduced and established.

The reasons upon which the doctrine is founded have been so clearly stated by this Court, and the instances of its application have been so numerous, that it is quite unnecessary to refer to other authorities either for its support or its illustration. In fact, it has for nearly a century been accepted in this State as established and familiar law. The cases have all been cited in argument, and we shall refer to a few of them only. The first is that of *State vs. Jordan,* 3 *H. & McH.,* 179, where a testator gave legacies to his grand-children, and made his *executors* their *guardians,* and in a suit by one of these legatees upon the bond of the *executors,* it was held, that the bond was not liable, because the legacy by operation of law had

passed to the *guardians.* In this case, which was decided by the General Court, the question arose on the pleadings which are set out in 2 *Harr. Ent.*, 326 to 329. This was followed by the case of *Downes vs. The State*, 3 *H. & J.*, 239, where the same question was decided in the same way by the Court of Appeals. In neither of these cases . was any opinion filed, but in *Seegar vs. The State*, 6 *H. & J.*, 162, an opinion was delivered and the Court say: "it is an *established* principle of law, that where the same person who acts as the *administrator* of a deceased party is appointed *guardian* to the representatives, that whatever balance is in his hands at the rendition of the final account, (and perhaps, even prior to that time) is in his hands and possession not as *administrator* to the deceased, but as *guardian* to the representatives. This transfer is by operation of law. The administrator having in his hands a balance that ought to be paid over to the guardian, and *one person representing both these characters*, he cannot pay the money over to himself, nor, if the payment was refused, is there any person who could enforce it. Under these circumstances, the law, by implication, considers it in the hands and possession of the party in *that representative character* that *ought to receive it.*" The reason of the rule thus stated, is substantially the same as that which is more elaborated by Judge STORY, in *Taylor vs. Deblois*, 4 *Mason*, 131. Again in *Watkins vs. The State*, 2 *G. & J.*, 220, we have the emphatic declaration, that where an executor "sustains the two-fold character of executor and guardian, *the law will adjudge* the ward's proportion of the property then in his hands, to be in his hands in the capacity of *guardian*, after the time limited by law for the settlement of the estate, *whether a final account has been passed by the Orphans' Court or not;* upon the principle that what *the law has enjoined upon him to do, shall be considered as done*, and from that time he holds the ward's proportion of the property *by operation of law,*

in that character in which he would be entitled to receive
it upon a final completion of his trust as executor." So
in *Flickinger vs. Hull*, 5 *Gill*, 60, we find the principle
stated thus: "where a person in one character is debtor,
and the same person in another character is creditor, the
.law regards the debt as paid by the debtor capacity to the
creditor; and this is on the same principle which governs
in the case where a man has several capacities, and is
found in possession of property, the law will attach the
possession to the capacity in which, of right, it ought to
be held." And finally in *Hanson vs. Worthington*, 12 *Md.*,
418, the same party was, as in the present case, both
*executor* and *trustee* under the will, and it was not only
decided, that by operation of law the fund would be con-
sidered in his hands as trustee after the time limited by
law for the settlement of the estate, but, that the probate
of the will, and the taking out of letters testamentary by
the executor, was sufficient evidence of *the acceptance by
him of the trust created by the will.* It is plain, therefore,
that the principle is one which has been established for
the promotion of justice, and for that purpose it holds
parties in such cases to the same responsibility, and
requires of them the same discharge of duty in respect to
their several capacities, as if those capacities were repre-
sented by different persons. If then, we are right in our
construction of this will, and the duties of the executors
thereunder, it is clear beyond controversy, that had the
*trustees been different persons,* they would have been entitled
to receive from the *executors,* and in case of refusal, to sue
for, and recover from them the sum· mentioned in the
second administration account, as due the estate, imme-
diately after the passage of that account, if not before,
and .the other sums subsequently received by Coale as
executor, within a reasonable time after their receipt, as
stated in the defendants' first and second prayers. It fol-
lows, then, that the principle must be applied to the

exoneration of this bond, unless its application is prevented by one or both of the two objections, we are now prepared to consider.

1st. The first of these objections is that the executors, and Coale especially, continued to deal with the estate, and professed to act in respect thereto, *as executors*, long after the time when it is claimed the transfer by operation of law took place. Among the facts mainly relied on by the appellants as showing that the executors did so act, are the purchase of the leasehold and fee simple interest in the Monument street property, and taking the conveyances therefor to themselves as executors, and the subsequent sale and conveyance of the same to Carroll, the purchaser, by them in the same capacity; the purchase and taking title to the Eutaw street property in the same character; the keeping by Coale of accounts in bank as executor, and drawing checks thereon signed by him as executor; and the testimony of several witnesses, as well as papers and other documentary proof, showing that during all this time and up to a short period before his death, he professed to act, and openly acted as executor and not as trustee. Now giving to this proof the utmost weight that can be accorded it, and assuming that it establishes the fact that these executors thus continued to act in that capacity, the objection at last amounts to this, and if sustained it would result, that a party who is both executor and trustee under a will, can by his *own election* continue the office of executor long after his duties as such had in fact ceased, and the time allowed by law for the settlement of the estate had elapsed, and long after the arrival of the period when he ought to have acted as trustee, and discharged the duties pertaining to that capacity. This would make the transfer depend not upon the law, or any regard for the proper discharge of his duties, but upon the mere will and pleasure of the party, and, as has been well said by the appellees' counsel, is utterly

inconsistent with the existence of the doctrine itself. The
law operates the transfer because of, and in accordance
with the duties devolved upon the same party in his
several capacities, and to allow that transfer to be de-
feated by his mere choice and election, would strike down
all the advantages of the rule, and it might as well cease
to exist. No such interruption to its operation has been
recognized or alluded to in any of the Maryland cases, and
it would seem that its usefulness is best illustrated by ap-
plying it for the *prevention* of such conduct, and the injuri-
ous consequences that might result therefrom. It is appa-
rent that if such an objection should be sustained, it would
open the door to fraud and combinations between the
party and the sureties upon the bond which *ought to be
held responsible*, and in many cases lead to gross and
flagrant injustice. Nor is the appellants' case helped
by the fact that the investment of part of these funds in
the Monument street property was, on application, author-
ized and directed by an order of the Orphans' Court, or
that as late as 1870 and 1871 citations were issued by that
Court to the executors to state a further account. We have
shown that the executors had no power to make invest-
ments. That duty was devolved upon the *trustees*, and the
Orphans' Court had no jurisdiction over the administra-
tion of that trust; and, as we have seen, the operation of
the transfer is not dependent upon the passage of a final
account by the executors. It may not be necessary to
decide the point in this case, but we find no difficulty in
regard to the *title* to the real estate thus taken and trans-
ferred by the executors. The same parties were author-
ized to purchase and sell as *trustees*, and the fact that they
took and executed conveyances as *executors*, would seem to
make a case covered by what is said in *Flickinger vs. Hull*,
viz.: where a party has various capacities, and executes an
authority delegated to him in one of those capacities, the
law will attribute the act to the proper authority, although

he does not profess to execute it in virtue of that particular power. It follows that this first objection cannot be sustained.

2nd. The next objection is, that prior to the time when the transfer by operation of law could have taken place, Coale had wasted the assets so that there was nothing then in his hands as executor to be transferred to or held by him as trustee, and consequently the liability of his bond as executor, notwithstanding the admissions in his administration account, was then fixed and so remained until his death. Whether in such a case there can be such a wasting of assets as will prevent the operation of the rule, is a question not settled by the Maryland authorities. It was alluded to but not decided in the case of *Seegar vs. The State.* In that case it appears that Seegar married the *administratrix* of a deceased husband, and afterwards became guardian of the children of the deceased, and it was contended the widow had wasted a portion of the assets before she married Seegar, so that the *whole* did not come into his possession as administrator by virtue of his marriage, and it could not therefore be transferred to him as guardian by operation of law. It was in view of that state of facts that the Court said: "If the amount of property wasted by the wife had been *more* than *she* was entitled to receive upon the settlement of her deceased husband's estate, a *question might arise which is not necessary to be considered in this case*, as it is not brought into view by the testimony in the record." It was then held, that as it appeared that the sum wasted by the wife was less than what she was entitled to retain as widow, it clearly followed that Seegar, when he rendered his final account with his wife, as administrator, was in possession of the whole amount due the children of the deceased, and consequently the sureties on the administration bond were released by the transfer by operation of law, of that amount to the guardian. But assuming the proposition to

State, use of Gable, *et al. vs.* Cheston and Carey.

be true, that if the assets are wasted by the executor, before his duties as such have ceased, so that nothing then remains in his hands upon which the transfer can operate, his bond as executor will remain liable, we are very clearly of opinion there is no sufficient evidence in the record, that Coale had so wasted the assets at any date prior to the time when by operation of law, they would be considered in his hands as trustee.    It is not a mere technical *devastavit*, such as failing to keep the funds of the estate ear-marked and separate from his own, or mingling them with his own, that will amount to such wasting.    But this is all that the evidence shows was done by this executor.    He did not keep the money of the estate separate from his own, but opened an account in bank, as executor, in May, 1856, which was continued until July, 1862, and with the deposits thus made mingled a large amount of his own money, and drew checks upon the same indiscriminately, for his own purposes as well as for the estate.    But there is nothing to show that at any of the periods when the law would effect the transfer, he had not in hand, or under his immediate control, a sufficient sum to meet all his liabilities as executor, and above all, there is not a particle of evidence that at these times he was not perfectly solvent, or that he was even embarrassed, and not perfectly ready and able to meet promptly every demand that could lawfully be made upon him as executor or otherwise.    In this state of case, we have no hesitation in deciding there was nothing to prevent the transfer, and being of that opinion, we cannot sustain this objection.

These views cover all the material questions presented by this appeal, and if they are correct, there was no error in the rulings which sustained the defence of transfer by operation of law, and it follows that the judgment must be affirmed.

*Judgment affirmed.*

(Decided 27th March, 1879.)